THE FEDERAL LAND BANK OF ST. LOUIS *v.* LEWIS.

4-5630                                           132 S. W. 2d 810

Opinion delivered November 6, 1939.

G. V. Head, W. H. Bengel and John M. Rose, for appellant.

W. L. Parker and Thomas M. Parker, for appellee.

SMITH, J. This suit was brought by the Federal Land Bank of St. Louis, to foreclose a mortgage executed to it by J. F. Lewis, now deceased, and his wife Sarah who is now confined in the State Hospital for Nervous Diseases under an adjudication by the probate court of the county of her residence that she was insane.

A portion of the land mortgaged was owned by Lewis and his wife as tenants by the entirety, the balance was owned by Lewis personally.

The suit was defended upon the ground that Mrs. Lewis was insane when she executed the mortgage, and the court below found the fact to be that she was insane at that time, and decreed accordingly, and this appeal is from that decree.

The question presented for our decision is whether this finding is contrary to the preponderance of the evidence, and as we think it is, the testimony on that issue will be recited somewhat more extensively than would be done if we concurred in the chancellor's finding.

There was offered in evidence a letter written by the superintendent of the hospital, which appears to have been treated by consent as the deposition of the superintendent, which reads as follows:

"Mr. W. L. Parker,

"Mena, Arkansas.

"Dear Sir:

"Complying with your request of the 21st, will say our records reveal that Sarah Lewis was admitted to this hospital February 4, 1923, from Polk county, Arkansas, and paroled April 21, 1923, to J. F. Lewis, Hatfield, Arkansas; discharged April 21, 1924, by expiration of parole; Improved. She was readmitted March 14, 1932, from Polk county, at the age of sixty-nine, and she continued to reside in the hospital since that time. The diagnosis in her case is Senile Psychosis; Simple Senile Deterioration.

"Yours very truly,

"R. E. Rowland, M. D.

"Superintendent."

It appears, from this letter, that, after having been a patient at the hospital for something less than two

months, Mrs. Lewis was paroled as an improved patient, and one year thereafter, the parole having expired, she was discharged. Nearly eight years thereafter she was readmitted, and she has since been, and is now, a patient at the hospital. Between the time of her discharge and her readmission, the mortgage in question was executed, the date thereof being August 1, 1924.

The only practicing physician called by appellees as a witness was Dr. B. H. Hawkins, who testified that senile psychosis was a form of insanity known as hardening of the brain or arteries, and that it was not curable, and that the fact that Mrs. Lewis had been dismissed from the hospital did not mean that she was cured. He stated, however, that persons so affected do have lucid intervals, and, when asked, on his direct examination, ''Whether a person diagnosed as Mrs. Lewis is would have mental capacity during lucid intervals to sign mortgages or deeds?'' answered that this would depend upon the condition of her mind at that time.

A witness giving testimony tending strongly to show that Mrs. Lewis was insane at the time of the execution of the mortgage, was Ed Myers. This witness lived near Mrs. Lewis for a number of years, and saw her frequently, and was of the opinion that she had no lucid intervals. On one occasion, while Mrs. Lewis was visiting at the home of witness, she began making a pie. All at once she quit making the pie, and said she had to go home. This was prior to 1922. Witness saw Mrs. Lewis every week or two thereafter until 1926. He testified as to conduct on the part of Mrs. Lewis which confirmed his opinion that she was not sane. After his cross-examination witness was asked, on his redirect examination: ''Q. Mr. Myers, basing your answer on her conduct, as you have stated here, her laughing and her peculiar actions and talk and maneuvers, would you say at any time you ever saw her she was capable of transacting ordinary business?'' He answered: ''A. I couldn't say definitely.'' He did say, upon further direct examination, that he did not think he had seen Mrs. Lewis in the last fifteen or twenty years when she was capable of transacting business.

Other witnesses testified that Mrs. Lewis did her household work, but her husband assisted her. Mrs. Lewis thought someone was going to kill her, and was afraid of a mob. She burned some of her clothes, and on another occasion burned some of her bedding. When she did her laundry work, she would boil the colored and the white clothes together. Much testimony to this effect was given by Joe Anders and his wife, but Anders admitted that he had, himself, bought some land from Mr. and Mrs. Lewis on April 10, 1926.

Mrs. Mollie Lewis, a daughter-in-law, was appointed and is now acting as guardian for Mrs. Lewis. This witness saw Mrs. Lewis nearly every day, and stated that Mrs. Lewis was not competent to transact ordinary business from the time she returned home until she was recommitted, and expressed the opinion that her condition was no better at the time of her return than it was when she first became a patient. She stated that Mrs. Lewis "lived in an imaginary world; she had a man and she called him Holcop and he ruled for her." The testimony of this witness, if it stood alone, would be very convincing that Mrs. Lewis was at all times incompetent. Her interest in the litigation is, of course, apparent.

Alex Carper and G. H. Johnson testified as to conduct on the part of Mrs. Lewis indicating that she was insane.

Joe Lewis, a son, was called as a witness after appellant's rebuttal testimony had been offered. The testimony of this witness is to the definite effect that his mother was insane at all times since her first confinement in the hospital; but his interest also is apparent, and his testimony is greatly discredited by his denial that his mother signed the mortgage, a fact which no other witness disputes. That Mrs. Lewis did sign the mortgage is a fact established to our entire satisfaction.

Opposed to this testimony was that of J. B. Williams, a superannuated minister, who knew Mrs. Lewis prior to 1918 and until after 1934. He and his wife visited at the home of Mrs. Lewis, and he described the circumstances of this visit and the conduct of Mrs. Lewis during its continuance. He testified: "My personal ob-

servation was—I knew there was lots of ways that wasn't bright any way—I made the remark 'that woman is normal.' I knew her before." He was asked: "Q. Her demeanor appeared to be that of a normal person?", and he answered: "A. Yes, sir." The visit just referred to was made about three months before the execution of the mortgage. Witness saw Mrs. Lewis at church, and remarked "Well, they done a good job for that woman at Little Rock" (the location of the hospital).

L. A. Cummings lived about 500 yards from Mrs. Lewis since 1916, and was living there in August, 1924 (at which time the mortgage was executed). He noticed that she was queer and erratic, but there were times when she seemed to be normal and talked just like other persons. He was at the Lewis home many times, and stated that "Mrs. Lewis was then just like any other house wife," and he thought she had lucid intervals.

Dr. H. G. Heller, a local physician, was called by appellant, and, when asked about the mental capacity of a person suffering from senile psychosis, answered: "There are times when they will be in possession of all their faculties, and again they are not."

The testimony which appears to us to be very persuasive is that of the notary who took the acknowledgment of Mrs. Lewis to the mortgage. He testified that she personally appeared before him for that purpose, and that he never took an acknowledgment otherwise. He further testified that he read the mortgage to Mrs. Lewis, and she appeared to understand fully what she was doing, and, while he did not know that she had ever been confined in the hospital, there was nothing in her conduct to cause him to suspect that she was an imbecile or incapacitated from managing her own affairs. When asked, "From your observation of Sarah Lewis, at the time she acknowledged the above mortgage, did she appear to fully understand that she was acknowledging a mortgage?" The witness answered: "She absolutely did. I read the mortgage to her." And he further testified that she appeared to fully under-

stand the effect of her act in acknowledging and in executing the mortgage.

It further appears that until his death in 1936, Mr. Lewis made regular payments as required by the mortgage without ever questioning its validity.

The law of this case is thoroughly settled, and has been announced in many of our cases. In one of those, that of *Eagle* v. *Peterson,* 136 Ark. 72, 206 S. W. 55, 7 A. L. R. 553, it was said that the true rule is that an adjudication of insanity is not conclusive—but *prima facie* only—of that fact. The discharge of Mrs. Lewis removed any presumption which arose from her confinement in the hospital.

In the case of *Equitable Life Assurance Society* v. *Mann,* 189 Ark. 751, 75 S. W. 2d 232, we said the effect of the parole of a patient previously confined in an insane asylum was to raise another presumption—that of restored sanity.

In the application for the loan in 1924 the age of Mrs. Lewis was stated to be 63 years, and as this was 15 years ago her present age is 78. It will be remembered that Mrs. Lewis was paroled as improved on April 21, 1923, and discharged one year later, on April 21, 1924, and was not again adjudged insane until March 14, 1932, which was eight years after her first discharge from the hospital.

We conclude from a consideration of the testimony which we have briefly summarized, that appellees have not met the burden resting upon them of showing that Mrs. Lewis did not realize and comprehend the nature and effect of her action in executing and acknowledging the mortgage, and the decree of the court below will, therefore, be reversed, and the cause remanded for further proceedings not inconsistent with this opinion.